[Cite as *State v. Wells*, 2017-Ohio-420.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2016-02-009 |
| | : | O P I N I O N |
| - vs - | | 2/6/2017 |
| | : | |
| AUSTIN ZACKERY WELLS, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 15CR31332

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

The Helbling Law Firm, LLC, John J. Helbling, 6539 Harrison Avenue, Suite 124, Cincinnati, Ohio 45247, for defendant-appellee

**HENDRICKSON, J.**

{¶ 1} Defendant-appellant, Austin Zackery Wells, appeals his convictions for involuntary manslaughter and corrupting another with drugs following a jury trial in the Warren County Court of Common Pleas. For the reasons set forth below, we affirm his convictions.

{¶ 2} In the early morning hours of January 20, 2015, Ryan Patrick traveled to

appellant's home on Reading Road in Mason, Warren County, Ohio to exchange his prescription Klonopin for illegal drugs. After obtaining "dope" from appellant, Patrick injected the drug and immediately overdosed. Paramedics were called to appellant's home. However, after more than 20 minutes of life-saving efforts proved unsuccessful, Patrick was pronounced dead. Testing of Patrick's blood and vitreous fluid indicated that at the time of his death, Patrick had cocaine metabolites and fentanyl in his system.

{¶ 3} Following an investigation into Patrick's death, appellant was arrested and subsequently indicted on one count of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree, and one count of corrupting another with drugs in violation of R.C. 2925.02(A)(3), a felony of the second degree. Appellant entered a not guilty plea to the charges and a three-day jury trial commenced on December 7, 2015. At this time, the state called as witnesses Patrick's fiancé and mother, emergency personnel members who responded to appellant's home, law enforcement officers who investigated Patrick's death, a forensic toxicologist, and the Warren County Coroner.

{¶ 4} Patrick's fiancé, Crystal Lingar, and his mother, Tracey Miller, testified about Patrick's history of drug abuse. Lingar testified that she knew Patrick had used marijuana and cocaine a "couple of times" in the past, but both she and Miller agreed that Patrick's "drug of choice" was heroin. According to Lingar, Patrick would take the drug by injecting it into his arm. Patrick's drug use resulted in a number of overdoses. Miller testified she had witnessed Patrick overdosing on at least three occasions.

{¶ 5} However, around the time of Patrick's death, both Miller and Lingar believed Patrick was sober. Lingar believed Patrick had been sober from December 2, 2014, until the date of his death. Both women testified that they saw Patrick daily, or nearly every day, around the time of his death and neither believed he was using narcotics. Miller stated she could "usually tell" if Patrick was using illegal drugs. Both Lingar and Miller also testified

- 2 -

Patrick had been taking the prescribed drug Klonopin, but Patrick had not been prescribed fentanyl.

{¶ 6} In the hours before his death, Patrick visited his mother to ask for money. According to Miller, Patrick was acting "high strung," and he got angry when she would not give the requested funds. Although it was "a little out of the ordinary" for Patrick to ask her for money, she did not think he was "on something at the time." Nonetheless, she did not give Patrick money because she worried he would use the money to obtain drugs.

{¶ 7} Lingar testified she spent all day with Patrick on the day before his death, as the two were celebrating her birthday. After eating a late supper, the two returned to their home in Liberty Township. Sometime after 11:30 p.m., appellant messaged Patrick over Facebook Messenger. Patrick told Lingar that appellant wanted to "borrow" a couple of his prescription Klonopins. Lingar and Patrick got into an argument after Patrick indicated his desire to drop the pills off at appellant's home. Lingar explained she did not want Patrick going to appellant's home because appellant had been a "source of drugs" in the past. Lingar stated that before she and appellant got sober, appellant had provided them with heroin in exchange for Klonopin pills. Lingar also testified that she and appellant had used heroin with appellant in the past.

{¶ 8} Despite her fears that going to appellant's house would cause Patrick to relapse, Lingar drove Patrick to appellant's home in Mason, Ohio. Lingar remained in the car while Patrick went inside appellant's residence. After Patrick did not return to the vehicle after 20-to-30 minutes, Lingar began to worry. At 3:26 a.m., she began texting Patrick to "[c]ome on." Patrick responded by text at 3:29 a.m., stating, "I will." However, Patrick did not return to Lingar's car and he did not respond to her repeated texts to "hurry" or her threats to leave. Lingar began calling Patrick's cell phone. A number of her calls went unanswered before appellant answered Patrick's phone and told her that Patrick had "O.D.'d in his

bathroom."

{¶ 9} Lingar ran into appellant's home and found Patrick laying in the doorway between the back bedroom and its attached bathroom. He was "[k]ind of slouched on a little pile of clothes" with his head "propped up against the wall." He was "discolored, purplish in the face and arms." Appellant told Lingar he had attempted to revive Patrick by tapping his face and putting ice down his pants, but these measures proved unsuccessful. Lingar wanted to call 9-1-1 right away, but appellant asked her to wait until he and his father could get out of the house as he had an outstanding warrant.

{¶ 10} Lingar called 9-1-1 and reported that Patrick had "overdosed on something," she did not know what drug, but thought it was heroin given that was the drug Patrick customarily used. Lingar performed CPR while waiting for emergency personnel to arrive on the scene. While she performed CPR, Patrick made gurgling noises and vomited.

{¶ 11} Paramedic Dustin McGhghy responded to appellant's home. McGhghy testified that at the time he arrived, Patrick was not breathing and had no pulse. McGhghy explained Patrick had a lot of vomit coming out of his mouth and nose. Narcan was administered in an effort to reverse the effects of the suspected narcotics overdose. Patrick did not respond to two separate doses of Narcan or to epinephrine that was administered in an effort to get his heart started again. After more than 20 minutes of life-saving efforts proved unsuccessful, Patrick was pronounced dead.

{¶ 12} Doyle Burke, the chief investigator for the Warren County Coroner's Office, arrived on the scene to inspect the body and determine whether the coroner's office was going to conduct an autopsy. Burke observed Patrick had a fresh needle mark on his left forearm and his body was located next to a sink which had a washcloth and bottle cap on it. Burke found the washcloth significant as it had blood on it that was consistent with a needle being wiped off. He found the bottle cap significant because narcotics are frequently diluted

by drug-users in a bottle cap in order to make the drugs easier to inject. Given his observations at the scene and the information he obtained about Patrick's history of drug use and overdosing, Burke determined that Patrick's body would not be autopsied. Instead, Burke drew blood from Patrick's heart and vitreous fluid from his eye so that the samples could be tested.

{¶ 13} Jeff Wyss, a detective with the Mason Police Department, responded to appellant's home to investigate Patrick's death. Wyss observed the fresh needle mark on Patrick's arm and found a spoon in Patrick's pocket. Wyss did not find a syringe at the scene.

{¶ 14} Wyss began looking into the whereabouts of appellant, and discovered that appellant had been arrested around 4:00 p.m. on January 20, 2015, in Cincinnati, Ohio. At the time of appellant's arrest, he had a syringe in his possession and was overdosing. Appellant was transported to the Hamilton County Justice Center, where he again overdosed. Appellant was transferred to a local hospital, and Wyss made contact with him around 10:00 a.m. on January 21, 2015.

{¶ 15} Wyss testified he read appellant his *Miranda* rights and appellant waived these rights. Appellant then told him that Patrick had traded four of his prescription Klonopins for some "dope," which he identified as heroin. After Patrick injected himself near appellant's sink, he "fell out," or overdosed, and fell backwards. Appellant stated he had "never" seen someone "fall out" so quickly, and he commented that he also "went out that quickly yesterday." Appellant informed Wyss that the drug "probably had fentanyl in it." Appellant admitted to leaving his home after Lingar called 9-1-1, stating he could not be there anymore. He denied knowing what happened to the needle Patrick used, stating he "didn't touch it."

{¶ 16} Dr. Matthew Juhascik, the chief forensic toxicologist for the Montgomery County Coroner's Office, testified that his lab performed the testing on Patrick's blood and

vitreous fluid samples. Initial testing of the samples revealed positive results for benzodiazepine, cocaine metabolite, fentanyl, and opiates. The positive result for benzodiazepine was not surprising, given Patrick's prescription for Klonopin. After a second test was run, a "confirmation test," it was determined that there was an insufficient amount, or an unreportable amount, of opiates in Patrick's samples. Therefore, the only reportable positive results were for benzodiazepines, cocaine, and fentanyl. With respect to the cocaine found in Patrick's samples, Juhascik explained that two cocaine metabolites were detected. According to Juhascik, "when someone takes a drug, the body's goal is to get the drug out of the body and how it does that is by breaking it down into something that can be easily passed through urine or feces and those are called metabolites."

{¶ 17} Juhascik explained that toxicology results alone do not determine a cause of death. Rather, one

> need[s] to take the toxicology results, the scene findings, if there was an autopsy done, the findings of the autopsy and put together all the pieces of the puzzle to determine what the full picture looks like. You can't just take this one piece and try to figure out what the whole picture looks like.

Looking at the results of Patrick's samples alone, Juhascik opined that it is possible that the person from whom the samples came from could still have been alive.

{¶ 18} Dr. Russell Uptegrove, a forensic pathologist and the Warren County Coroner, testified that the cause of Patrick's death was "multiple drug intoxication (fentanyl and cocaine)." He opined that the fentanyl found in Patrick's blood was the most significant factor in determining Patrick's cause of death. Because the parent compound of fentanyl was found in Patrick's blood, and not its metabolite, Uptegrove explained that "there wasn't a significant time interval from when he got the fentanyl parent compound before he ultimately died." The fentanyl was a recent, acute dosage. The quantity of fentanyl found in Patrick's blood was 8.3 plus or minus 1.7 nanograms per milliliter, which was "certainly more than

adequate to cause someone's death." This amount of fentanyl was "much higher" than the normal dosage level of someone prescribed fentanyl, and Uptegrove was aware of individuals who had died because of fentanyl with "levels even less than [Patrick's]." Uptegrove explained fentanyl is a "central respiratory depressant" that diminishes the innate drive to breath. The drug also causes the development of pulmonary edema fluid in the lungs, wherein fluids leak into the air spaces of the lungs, making it more difficult to breath. In Uptegrove's opinion, Patrick died on January 20, 2015, because the level of fentanyl in his system caused him to stop breathing. However, on cross-examination, Uptegrove admitted that because an autopsy was not done, he could not testify that Patrick had "heavy lungs" at the time of his death.

{¶ 19} Following the state's presentation of its case-in-chief, the trial court admitted into evidence various exhibits offered by the state, including a recording of Lingar's 9-1-1 call, photographs of appellant's home, text messages Lingar sent to Patrick on January 20, 2015, a recording of Wyss's January 21, 2015 interview of appellant, the toxicology report, and Patrick's death certificate. Appellant then moved for acquittal pursuant to Crim.R. 29, but his motion was denied by the trial court. Thereafter, appellant rested his defense without calling any witnesses and the matter was submitted to the jury.

{¶ 20} The jury returned guilty verdicts on both counts. At appellant's January 20, 2016 sentencing hearing, the trial court determined that the offenses of involuntary manslaughter and corrupting another with drugs were allied offenses of similar import. The state elected to proceed on the involuntary manslaughter conviction, and appellant was sentenced to a ten-year prison term.

{¶ 21} Appellant appealed, raising four assignments of error. For ease of discussion, we will address appellants first, second, and third assignments of error together.

{¶ 22} Assignment of Error No. 1:

{¶ 23} THE JURY ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY FINDING HIM GUILTY OF THE CHARGES AGAINST HIM WITHOUT SUFFICIENT EVIDENCE.

{¶ 24} Assignment of Error No. 2:

{¶ 25} THE JURY ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY FINDING HIM GUILTY OF THE CHARGES AGAINST THE WEIGHT OF THE EVIDENCE.

{¶ 26} Assignment of Error No. 3:

{¶ 27} THE TRIAL JUDGE ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY DENYING HIS MOTION FOR ACQUITTAL UNDER OHIO RULE OF CRIMINAL PROCEDURE 29.

{¶ 28} In his first, second, and third assignments of error, appellant argues the trial court erred by denying his Crim.R. 29 motion for acquittal, his convictions were not supported by sufficient evidence, and his convictions were against the manifest weight of the evidence. Specifically, appellant contends the state failed to prove that he caused Patrick's death by providing him with a controlled substance. He argues "[t]here is absolutely no evidence * * * that [he] provided cocaine or fentanyl" to Patrick. Further, relying on the toxicologist's testimony, he argues that the level of fentanyl in Patrick's system was not fatal and, therefore, not the "cause" of Patrick's death.

{¶ 29} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." An appellate court reviews the denial of a Crim.R. 29(A) motion under the same standard as that used to review a sufficiency-of-the evidence claim. *State v. Mota*, 12th Dist. Warren No. CA2007-06-082, 2008-Ohio-4163, ¶ 5; *State v. Huston*, 12th Dist. Fayette Nos. CA2006-05-021 and CA2006-06-022, 2007-Ohio-4118, ¶ 5.

- 8 -

{¶ 30} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 31} On the other hand, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. In reviewing the evidence, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 32} Further, although the legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19. *See also State v. Hart*, 12th Dist. Brown No. CA2011-03-008, 2012-Ohio-1896, ¶ 43 ("a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency").

{¶ 33} A defendant's convictions may be based on circumstantial evidence alone. *State v. Brown*, 12th Dist. Butler No. CA2014-12-257, 2015-Ohio-3407, ¶ 12. "Circumstantial evidence is proof of certain facts and circumstances in a given case, from which the jury may infer other, connected facts, which usually and reasonably follow according to the common experience of mankind." *State v. Stringer*, 12th Dist. Butler No. CA2012-04-095, 2013-Ohio-988, ¶ 31. Circumstantial evidence inherently possesses the same probative value as direct evidence, and a conviction based on circumstantial evidence is no less sound than one based on direct evidence. *Brown* at ¶ 12.

{¶ 34} To convict appellant of involuntary manslaughter, the state had to prove he "cause[d] the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A). The predicate felony underlying appellant's involuntary manslaughter conviction was corrupting another with drugs in violation of R.C. 2925.02(A)(3). To convict appellant of this offense, the state had to prove appellant " knowingly * * * [b]y any means, administer[ed] or furnish[ed] to another or induce[d] or cause[d] another to use a controlled substance, and thereby cause[d] serious physical harm to the other person, or cause[d] the other person to become drug dependent." R.C. 2925.02(A)(3).

{¶ 35} As this court has previously recognized, "[t]he element of proximate cause is

satisfied where the defendant, 'sets in motion a sequence of events that make the death of another a direct proximate and reasonably inevitable consequence.'" *State v. Feltner*, 12th Dist. Butler No. CA2008-01-009, 2008-Ohio-5212, ¶ 12, quoting *State v. Lovelace*, 137 Ohio App.3d 206, 215 (1st Dist.1999).

> Generally, for a criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result meaning that the result would not have occurred "but for" the conduct. Second, when the result varied from the harm intended or the hazarded, it must be determined that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable.

*Lovelace* at 216, citing LaFave & Scott, *Criminal Law*, Section 35, at 246 (1972). However, "[i]t should be emphasized that for something to be foreseeable does not mean that it be actually envisioned." *Id.* at 219. "It is not necessary that the accused be in a position to foresee the precise consequence of his conduct; only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct." *State v. Losey,* 23 Ohio App.3d 93, 96 (10th Dist.1985).

{¶ 36} After reviewing the record, weighing inferences and examining the credibility of the witnesses, we find that appellant's convictions for involuntary manslaughter and corrupting another with drugs were supported by sufficient evidence and were not against the weight of the evidence. The state presented testimony and evidence from which the jury could have found all the essential elements of the offenses, including the causation element, proven beyond a reasonable doubt.

{¶ 37} At trial, the state introduced evidence that appellant was a source of drugs for Patrick. On January 20, 2015, Patrick went to appellant's home and exchanged prescription Klonopin pills for "dope," or a substance believed to be heroin. According to appellant's

statement to law enforcement, after appellant provided Patrick with the "dope," Patrick shot up and then "fell out" or overdosed. Appellant had "never" seen someone "fall out" so quickly. Subsequent testing of Patrick's blood and vitreous fluid indicated that at the time of his death, he had benzodiazepine, cocaine metabolites, and fentanyl in his system. As the toxicologist explained, both cocaine and fentanyl are schedule II controlled substances.

{¶ 38} The jury heard testimony from the coroner that the fentanyl found in Patrick's blood was the most significant factor in determining his cause of death. Because the parent compound of fentanyl was found, and not its metabolite, Uptegrove testified the fentanyl was a recent, acute dosage and that the amount of fentanyl found in Patrick's blood was "certainly more than adequate to cause someone's death." Uptegrove opined that the fentanyl caused Patrick to stop breathing. He described the effects fentanyl has on a person's ability to breath, explaining that consumption of fentanyl can cause pulmonary edema fluid, a "light frothy material," to come out of a person's mouth and nose, making it difficult for the person to breath, and causing the person to make snorting, grunting, or gurgling noises. The coroner's testimony was consistent with Lingar's description of what was happening to Patrick during the time she placed the 9-1-1 call. Lingar testified that Patrick was "throwing up" and making a "gurgling noise" as she performed CPR on him. The jury was entitled to find the foregoing testimony credible and to rely on this evidence in finding appellant guilty of involuntary manslaughter and corrupting another with drugs.

{¶ 39} With respect to his conviction for corrupting another with drugs, appellant disputes that the state presented "any evidence" tying him to the cocaine and fentanyl mixture found in appellant's system. He points out that the "crime scene did not have any drugs present," and that the evidence introduced at trial indicated he traded heroin, not cocaine or fentanyl, for Patrick's Klonopins. However, the fact that no drugs were recovered at appellant's home is irrelevant. Appellant admitted he gave Patrick "dope," Patrick injected

himself, and then immediately overdosed. Although appellant believed that the substance he had provided to Patrick was heroin, subsequent testing of Patrick's blood and vitreous fluid demonstrated the substance was not heroin, but rather a fentanyl/cocaine mixture. As the coroner explained at trial, it is not uncommon for fentanyl to be mixed with other drugs.[1] Appellant appeared to acknowledge this when he spoke with law enforcement on January 21, 2015, following his own overdose, telling Detective Wyss that the drug "probably had fentanyl in it." Therefore, given the evidence before it, we find that the jury did not lose its way in finding appellant furnished a controlled substance to Patrick and that his actions caused Patrick's death. There is nothing extraordinary or surprising about the manner of Patrick's death in relation to appellant's actions. Appellant provided drugs to a known drug abuser. The possibility of an overdose is a reasonably foreseeable consequence of providing a controlled substance to another. *See, e.g., State v. Patterson*, 11th Dist. Trumbull No. 2013-T-0062, 2015-Ohio-4423, ¶ 80-95; *State v. Zusman*, 11th Dist. Lake No. 2014-L-087, 2015-Ohio-3218.

{¶ 40} Appellant also challenges the reliability of the coroner's finding that the cause of death was "multiple drug intoxication (fentanyl and cocaine)." He argues that because cocaine metabolites, rather than the parent compound of cocaine, was found in Patrick's system, the cocaine could not have been a recent, acute dosage. He further disputes the

---

1. Dr. Uptegrove testified:

> This other powdery substance which was then introduced with heroin, and in some cases it's pure fentanyl. I've had several cases with individuals who went out and thought they were buying heroin, came back, did the drugs. One person died, the other person lived and so we asked that other person or the police asked the other person, what did you do, went out and bought heroin, so we did the screen on it and you know, there was no heroin there, so that was one of the first times when we started seeing that it was actually fentanyl. In some cases that was the only drug present, so now it really comes in waves, sometimes it's pure fentanyl, sometimes it's fentanyl and heroin, sometimes cocaine, fentanyl and heroin and sometimes even some methamphetamine mixed in there, so it is like roulette with the substances that are out there. I don't think people know exactly what they're getting.

coroner's testimony that the level of fentanyl in Patrick's blood was fatal in light of the toxicologist's testimony that it is possible that someone with the same level of fentanyl found in Patrick's system could still be alive. He also maintains that without a "proper autopsy" the coroner could not credibly opine as to the cause of appellant's death.

{¶ 41} At trial, the coroner and the corner's chief investigator both explained why an autopsy was not conducted on Patrick. As Patrick did not have trauma to his body, had a history of substance abuse, had a fresh needle mark on his arm, and other evidence indicating drug use was found at the scene, it was determined that an autopsy was not needed. A blood sample from Patrick's heart and vitreous fluid from his eye were taken for testing, and that testing revealed the presence of benzodiazepine, cocaine metabolites, and fentanyl in his system. Uptegrove found the high level of fentanyl in Patrick's blood to be the most significant finding of the toxicology report. While Uptegrove agreed with the toxicologist's general statement that it was possible for a person to live after having ingested the amount of fentanyl found in Patrick system's, he explained that it all "depend[ed] on tolerance." For instance, Uptegrove explained, if Patrick had been a cancer patient who received fentanyl on a consistent basis, then he could have tolerated the level of fentanyl found in his system. However, because Patrick was not a cancer patient and not been prescribed fentanyl, Uptegrove opined the level of fentanyl ingested was fatal. It was up to the jury to assign the amount of weight to be accorded to Uptegrove's testimony. *See State v. Mick*, 12th Dist. Fayette No. CA2011-08-017, 2012-Ohio-1598, ¶ 32. The fact that the jury chose to find his testimony reliable does not render its decision as being against the manifest weight of the evidence.

{¶ 42} Accordingly, given the evidence presented, we find that the jury did not lose its way and create such a manifest miscarriage of justice that appellant's convictions for involuntary manslaughter and corrupting another with drugs must be reversed and a new trial

ordered. As appellant's convictions were not against the manifest weight of the evidence, we necessarily conclude that the state presented sufficient evidence to support the jury's finding of guilt and to overcome appellant's Crim.R. 29 motion. *See Hart*, 2012-Ohio-1896, ¶ 43.

{¶ 43} Appellants first, second, and third assignments of error are, therefore, overruled.

{¶ 44} Assignment of Error No. 4:

{¶ 45} DEFENDANT-APPELLANT WAS PREVENTED FROM HAVING A FAIR TRIAL BY INEFFECTIVE ASSISTANCE OF COUNSEL IN THAT TRIAL COUNSEL FAILED TO FILE A MOTION TO SUPPRESS HIS CONFESSION FROM EVIDENCE.

{¶ 46} In his fourth assignment of error, appellant contends his trial counsel was ineffective for failing to file a motion to suppress the statements appellant, while hospitalized, made to Detective Wyss on January 21, 2015.

{¶ 47} "To establish a claim of ineffective assistance of counsel, a defendant must show that his or her counsel's actions were outside the wide range of professionally competent assistance, and that prejudice resulted by reason of counsel's actions." *State v. Ullman,* 12th Dist. Warren No. CA2002-10-110, 2003-Ohio-4003, ¶ 43, citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). To show prejudice, a defendant must prove there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Wilson,* 12th Dist. Madison No. CA2013-10-034, 2014-Ohio-2342, ¶ 17, quoting *Strickland* at 694.

{¶ 48} The failure to file a motion to suppress does not constitute per se ineffective assistance of counsel. *State v. Smith,* 12th Dist. Fayette No. CA2014-05-013, 2015-Ohio-1094, ¶ 44. "Where the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion." *State v. Drummond*, 111 Ohio St.3d 14, 2006-

- 15 -

Ohio-5084, ¶ 208. The failure to file a motion to suppress "signifies ineffective assistance of counsel only when the record establishes that the motion would have been successful if made." *State v. Kelly*, 12th Dist. Butler No. CA2006-01-002, 2007-Ohio-124, ¶ 25. Further, even when there is some evidence in the record to support a motion to suppress, "an appellate court presumes that defense counsel was effective if defense counsel could reasonably have decided that the motion to suppress would have been futile." *State v. Dominguez,* 12th Dist. Preble No. CA2011-09-010, 2012-Ohio-4542, ¶ 20.

{¶ 49} Here, appellant claims that "[h]ad the audio taped interrogation been properly litigated * * * there is a high likelihood the [m]otion would have been granted given the circumstances and condition of [appellant] at the time of the interrogation." Essentially, appellant argues his statement to Wyss would have been deemed inadmissible as the state would not have been able to demonstrate he knowingly, intelligently, and voluntarily waived his right to counsel or his privilege against self-incrimination given that he was recovering from a drug overdose.

{¶ 50} The Fifth and Sixth Amendments to the United States Constitution guarantee, respectively, that "'[n]o person * * * shall be compelled in any criminal case to be a witness against himself,' and that 'the accused shall * * * have the Assistance of Counsel.'" *Miranda v. Arizona,* 384 U.S. 436, 442, 86 S.Ct. 1602 (1966). *State v. Barker*, Slip Opinion No. 2016-Ohio-2708, ¶ 21. To ensure a defendant's constitutional rights are protected, statements resulting from custodial interrogations are admissible only after a showing that procedural safeguards effective to secure the privilege against self-incrimination have been followed. *Miranda* at 444; *State v. Johnson*, 12th Dist. Warren No. CA2015-09-086, 2016-Ohio-7266, ¶ 75.

{¶ 51} Whether a defendant made a statement voluntarily and whether the defendant voluntarily, knowingly, and intelligently waived his right to counsel and against self-

incrimination are distinct issues. *See State v. Dennis*, 79 Ohio St.3d 421, 425 (1997); *State v. Chase*, 55 Ohio St.2d 237, 246 (1978). "Both, however, are measured by the totality-of-circumstances standard." *Dennis* at 425. Under this standard, a court should consider "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31 (1976), paragraph two of the syllabus, *vacated on other grounds*, 438 U.S. 911, 98 S.Ct. 3147 (1978).

**{¶ 52}** In the present case, appellant cannot demonstrate that his trial counsel was ineffective for electing not to file a motion to suppress. The record before us does not establish that such a motion would have been successful if made. Rather, to the contrary, the record indicates that appellant made a voluntary statement to Wyss after being advised of his *Miranda* rights and voluntarily, knowingly, and intelligently waiving such rights.

**{¶ 53}** At trial, Wyss testified appellant had overdosed after being arrested and jailed at the Hamilton County Justice Center. Appellant's overdose occurred sometime after 4:00 p.m. on January 20, 2015. The following morning, at 10:00 a.m., Wyss went to the hospital where appellant was being treated. Wyss entered appellant's hospital room and was advised by a guard that appellant was "just sleeping." Wyss observed that appellant was not hooked up to any medical apparatuses other than an I.V. in his arm. Wyss tapped appellant's foot to see his reaction to "minimal stimuli" and appellant easily woke up. Wyss than had an "introductory conversation" with appellant, wherein he advised appellant of who he was and why he was there. Wyss stated that during this conversation, appellant was responding appropriately to the questions he was asked, he was engaged in the conversation, and he was not slumping over or falling "half-asleep." Wyss stated appellant did not appear incoherent, under the influence of any medication, or as though he was medically sedated. Based on his observations, Wyss stated, "I felt like he was perfectly fine and coherent to

speak to me. I've interviewed people in hospitals before that have been under the influence. Based on my experience, I can tell when someone has or is withdrawing or has sick symptoms or cravings. [Appellant] didn't appear to have any of those based on my experience."

{¶ 54} Wyss therefore read appellant his *Miranda* rights and asked if it was okay to speak with him. After appellant said yes, Wyss started recording and the interview began. The interview lasted approximately 15 minutes. At no point during the interview did appellant state he wanted to stop the interview because he was too weak, was in pain, or was medically unable to continue. Additionally, Wyss explained, no medical personnel ever told him that appellant was in an "altered state of mind."

{¶ 55} Given Wyss's testimony at trial, as well as this court's review of the audiotaped interview between appellant and Wyss, we find no prejudice resulted from defense counsel's decision not seek suppression of appellant's January 21, 2015 statement. The record before us indicates that appellant voluntarily, knowingly, and intelligently waived his *Miranda* rights and that his statement was voluntarily made. The fact that appellant was in the hospital after overdosing is only one factor that the court considers in its totality-of-the-circumstances analysis. "'[T]he presence of drugs or alcohol should be considered, [but] the amount must sufficiently impair the confessor's ability to reason.'" *State v. Stanberry*, 11th Dist. Lake No. 2002-L-028, 2003-Ohio-5700, ¶ 30, quoting *State v. Stewart*, 11th Dist. Portage No. 2001-P-0035, 2002-Ohio-7270, ¶ 49. Here, there is nothing in the record before us to suggest that appellant's prior drug use or his recent overdose overcame his rational facilities or altered his state of mind.

{¶ 56} Accordingly, we find no merit to appellant's argument that his trial counsel was ineffective for failing to file a motion to suppress his statement to Detective Wyss. Appellant's fourth assignment of error is overruled.

{¶ 57} Judgment affirmed.

S. POWELL, P.J., and RINGLAND, J., concur.