[Cite as *State v. Haines*, 2022-Ohio-1145.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-07-040 |
| | : | O P I N I O N |
| - vs - | | 4/4/2022 |
| | : | |
| LINDSAY HAINES, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2020 CR 000790

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas Horton, Assistant Prosecuting Attorney, for appellee.

W. Stephen Haynes, Clermont County Public Defender, and Robert F. Benintendi, Assistant Public Defender, for appellant.

**HENDRICKSON, J.**

{¶1} Appellant, Lindsay Haines, appeals from her convictions in the Clermont County Court of Common Pleas for involuntary manslaughter, corrupting another with drugs, trafficking in heroin, and aggravated trafficking in drugs. For the reasons set forth below, we affirm her convictions.

{¶2} On September 22, 2020, appellant was indicted on one count of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree, two counts of

corrupting another with drugs in violation of R.C. 2925.02(A)(3), felonies of the second degree, one count of trafficking in heroin in violation of R.C. 2925.03(A)(1), a felony of the fifth degree, and one count of aggravated trafficking in drugs (fentanyl) in violation of R.C. 2925.03(A)(1), a felony of the fourth degree. The charges arose following the overdose death of Ryan Richmond, an individual to whom appellant sold narcotics on December 2, 2017, the date Richmond died.

{¶3} Appellant pled not guilty to the charges and a three-day jury trial commenced on June 7, 2021. The state presented testimony from nine witnesses, including testimony from Thomas Baker, four Union Township police officers involved in the investigation of Richmond's death, two drug analysists from the Hamilton County Coroner's Crime Laboratory who analyzed evidence found in Richmond's bedroom, the toxicologist who ran tests on Richmond's blood and urine, and the deputy coroner who conducted Richmond's autopsy. Appellant did not present any witnesses.

{¶4} The testimony and exhibits presented at trial established the following facts. Baker and Richmond were friends and coworkers. Baker rented a house from his boss's mother on Clermont Lane in Clermont County, Ohio, and he permitted those who worked for him to reside there in order to ensure that they would show up for work. Despite knowing Richmond had a drug problem, Baker employed Richmond as a carpenter and allowed him to live in the rental home. However, because of prior instances of drug use which had led to Richmond being kicked out of the home, when Richmond moved back into the home in late November 2017, he was required to submit to weekly drug tests.

{¶5} On December 2, 2021, after a full day of work, Richmond and Baker returned to their home on Clermont Lane. Around 9:00 p.m. that evening, Richmond stopped by Baker's room to inform him he was going to bed. Baker saw Richmond enter his bedroom before Baker closed his door. Later that evening, Baker heard individuals knocking on

windows and then voices in his hallway. When he opened his bedroom door, he saw two women trying to get into Richmond's room. The two women were later identified as appellant and her girlfriend, Autumn Blankenship.

{¶6} Upon entering Richmond's room, Baker saw Richmond lying on the floor. Baker believed Richmond had already passed away, as he was "really blue, purple." Nonetheless, Baker attempted to render aid to Richmond. Baker called his mother, who is a first responder, for advice on how to help Richmond. Baker attempted to perform CPR on Richmond while shouting for someone else to call 9-1-1. While he was performing CPR, Baker noted that appellant was next to him, rifling through Richmond's pockets. After it became apparent to Baker that his efforts to help Richmond would not be effective, Baker stopped CPR and went to await the paramedics.

{¶7} Officers from the Union Township Police Department were dispatched to the Clermont Lane home at 10:45 p.m. following a report of an unconscious male who had possibly overdosed. Officer Ryan Maynard arrived on the scene at the same time as the paramedics. Once he entered Richmond's room, the officer found one woman attempting chest compressions on Richmond while another woman stood nearby. Officer Maynard directed the two women to exit the room so that the medics could attempt lifesaving measures on Richmond.

{¶8} Officer Maynard observed that Richmond had fluid coming out of his nose and appeared extremely blue in the face and outer extremities. The medics working on Richmond indicated Richmond was still warm to the touch. The medics administered Narcan and performed CPR, but Richmond did not respond to their efforts. Richmond was transported to a nearby hospital, where he was pronounced dead.

{¶9} Officer Alex Smith arrived on scene as the medics were preparing to transport Richmond to the hospital. Officer Smith secured the scene and obtained witness

statements from those present. Appellant prepared a written statement of events, stating that she had been communicating with Richmond throughout the day. Richmond had declined her repeated requests to go downtown with her, her girlfriend, and her girlfriend's kids to a Christmas event. After going to the downtown event and dropping off her girlfriend's kids, appellant and Blankenship decided to go to Richmond's residence and check on him. Appellant explained that Richmond had stopped answering her phone calls and texts, which was not like him. Around 10:30 p.m., appellant knocked on the door to Richmond's residence, but no one answered. Appellant and Blankenship walked to Richmond's window and looked in the home. Appellant saw Richmond sitting cross-legged on the floor with his head against the wall. Appellant knocked on the window but Richmond did not respond. Believing something was wrong, appellant opened the window and she and Blankenship crawled inside. Appellant pulled Richmond flat on the floor and began administering CPR. She stated she called 9-1-1 and continued to administer CPR until the medics and police arrived.

{¶10} While Officer Smith obtained witness statements, Officer Maynard began searching Richmond's bedroom. As Officer Maynard believed Richmond had overdosed on narcotics, he looked for evidence of drug use. Officer Maynard found Richmond's cell phone on the floor. He also located a used syringe in coveralls on the floor of Richmond's room and a small baggie with a powdery residue on or next to a sleeping mat on the floor. Officer Maynard testified that powdery drugs are typically stored in baggies the size he found in Richmond's room.

{¶11} Officer Maynard also conducted a search of the remainder of the home. In another room, the officer discovered two bags of marijuana. According to Baker, the marijuana belonged to another roommate named "Craig."

{¶12} The syringe and the baggie collected from Richmond's bedroom were sent to

the Hamilton County Crime Laboratory for analysis. The baggie tested positive for heroin and fentanyl and the syringe tested positive for heroin, fentanyl, and tramadol. Richmond's blood and urine were also tested for narcotics. Robert G. Topmiller, the chief of toxicology at the Hamilton County Coroner's Office, testified that peripheral blood from Richmond was tested to prevent postmortem distribution of any narcotics in Richmond's system. Richmond's blood was found to contain 0.015 milligrams per liter of the cocaine metabolite benzoylecgonine, 0.002 milligrams per liter of fentanyl, 0.015 milligrams per liter of codeine, and 0.400 milligrams per liter of morphine. Topmiller also tested Richmond's urine, which was found to contain 0.500 milligrams per liter of 6-monoacetylmorphine, a "direct metabolite that the body produces when someone takes in heroin." No other drugs or alcohol were found in Richmond's system.

{¶13} Topmiller testified that the low level of cocaine metabolite found in Richmond's system indicated Richmond had not used cocaine in the hours before his death. However, the combination of codeine, morphine, and 6-monoacetylmorphine indicated that Richmond had ingested heroin. He had also recently ingested fentanyl. Topmiller explained that because fentanyl breaks down quickly to the metabolite norfentanyl and there was no norfentanyl found in Richmond's system, he believed Richmond had died shortly after ingesting the fentanyl. Topmiller further explained that the combination of fentanyl and heroin has become so common that drug users actively seek it out, despite the high potency of fentanyl.

{¶14} Dr. Gretel Stephens, a deputy coroner with the Hamilton County Coroner's Office, testified she completed an autopsy on Richmond and reviewed Topmiller's toxicology report. Based on the autopsy and the toxicology results, Dr. Stephens rendered an opinion that Richmond had died from an overdose of heroin with cocaine metabolite and fentanyl also present. Dr. Stephens explained that while Richmond suffered from other

medical issues, including hepatitis C and left ventricular myocardial hypertrophy, he could have lived for another 50 years without treatment for said issues.

{¶15} Regarding the drugs found in Richmond's system, Dr. Stephens opined that Richmond had likely snorted the drugs rather than injected the drugs. She further testified that the level of cocaine present in Richmond's system, 0.015 milligrams per liter, almost never results in death. Rather, she explained, cocaine reliably kills one when it amounts to 1 milligram per liter. Dr. Stephens noted that Richmond had a "decent amount" of fentanyl in his system and that the 0.002 milligrams per liter of fentanyl "could have caused [Richmond] to become unconscious at that level" but would likely not have killed him on its own. However, Richmond had a significant amount of heroin in his system. Dr. Stephens testified Richmond had "taken enough heroin to kill two of him" and that the drug had been ingested a short period of time prior to his death. She explained that morphine that has been taken in by heroin can kill at a 0.1 milligram per liter and that Richmond had 0.400 milligrams per liter in his system. Dr. Stephens testified as follows regarding the effects of the heroin and fentanyl in Richmond's system:

> [Richmond] had all of those opiate-type drugs that were working on his respiratory capability. And his respiratory drive just was negated. And he just quit breathing. Once he quit breathing, then the heart can only pump for a while after that occurs. Usually a number of minutes. And once it's not getting oxygen and enough to keep it going, it stops. So this is the cascade that has led to Ryan Richmond's death.

{¶16} Detective Brandon Bishop was assigned to investigate Richmond's death. Prior to receiving Richmond's autopsy and toxicology reports, the detective received three anonymous calls from an individual who suggested that Richmond's phone be inspected to determine who had sold Richmond the narcotics that led to his death. The caller indicated an individual named "Josh" had sold Richmond methamphetamine. However, in Detective Bishop's nearly twenty years of experience responding to overdose deaths, only one case

- 6 -

involved an overdose via methamphetamine. Detective Bishop did not believe Richmond had overdosed on methamphetamine but had more than likely overdosed on heroin, fentanyl, or a combination of those two substances. Detective Bishop explained that heroin was a Schedule I controlled substance and fentanyl was a Schedule II controlled substance. According to the detective, it was common to see the two drugs combined and there appeared to be a greater chance of an overdose death when the two drugs were taken together. He further explained that the dangers of mixing the two drugs was well known in the law enforcement and drug community.

{¶17} Despite the anonymous caller's tip, Detective Bishop did not pursue "Josh" as a suspect. Instead, the detective reviewed Richmond's phone, taking pictures of Richmond's recent communications and contacts. He then sent Richmond's phone to Detective Ken Mullis for a forensic download of the information stored on the phone's internal memory system.

{¶18} Detectives Bishop and Mullis reviewed the forensic download of Richmond's cell phone, finding that text messages appellant and Richmond sent to one another on the day of Richmond's death were indicative of a drug deal.[1] The messages appellant and Richmond exchanged on December 2, 2017 were as follows:

> 4:13:09 p.m. – APPELLANT: Seriously call me when u about to get off.. I got your shit already cz he said he was prolly going to be leaving to go to Chicago at some point today so I went ahead and grabbed a whole one.. So got your half. Had him split in two.
>
> 4:13:53 p.m. – RICHMOND: Ok
>
> 4:22:30 p.m. – APPELLANT: Hope u wanted half ha figured u would.

---

1. The phone number appellant texted Richmond from was the same phone number appellant listed as her contact number on the written witness statement she provided to law enforcement on the evening of Richmond's overdose.

4:22:52 p.m. – RICHMOND: Lol ya as long as it weighs a half

4:23:44 p.m. – APPELLANT: Yea I had him make two separate ones so not touching yours

4:23:59 p.m. – APPELLANT: Its still all wrapped up for u

4:24:06 p.m. – RICHMOND: ok

4:26:10 p.m. – APPELLANT: Hey u think u can get Jacob tonight then you both can come with us and the girls downtown and watch Santa repeal and fireworks and shit

4:26:32 p.m. – RICHMOND: I doubt it but I can try

4:26:43 p.m. – APPELLANT: Ok

4:28:53 p.m. – APPELLANT: Ok we each have one too

4:29:40 p.m. – RICHMOND: lol

4:52:26 p.m. – RICHMOND: Getting in the truck now

4:55:43 p.m. – APPELLANT: Ok u coming to eastgate?

4:55:56 p.m. – RICHMOND: Ya

4:56:58 p.m. – APPELLANT: Ok still at her sisters but when u get close I can leave and meet u.

5:24:37 p.m. – APPELLANT: U want me to just come to your house?

5:25:22 p.m. – RICHMOND: Ya.. I'll be there in about 25 minutes

5:30:04 p.m. – APPELLANT: Ok

5:38:39 p.m. – RICHMOND: Passing beechmont

5:39:30 p.m. – APPELLANT: Ok ill start heading that way

5:39:38 p.m. – RICHMOND: K

5:51:07 p.m. – APPELLANT: Hurray out to the car when we get there. Ill let u know when we about to pull in

5:52:05 p.m. – RICHMOND: Let me know before u get here chrisnis here and we gotta ride down the street real fast. I can't

let him see anything

5:52:40 p.m. – APPELLANT:  Ok that's cool

5:56:26 p.m. – RICHMOND:  How long u thinkin

5:56:49 p.m. – APPELLANT:  Passin meijers

5:57:43 p.m. – RICHMOND:  Don't pull in my drive

5:57:53 p.m. – APPELLANT:  Ok

5:58:17 p.m. – APPELLANT:  What street is yours ago

5:58:54 p.m. – RICHMOND:  Clermont ln

5:59:44 p.m. – APPELLANT:  Come out

5:59:54 p.m. – RICHMOND:  Don't pukk in the drive

6:00:11 p.m. – RICHMOND:  There leaving gimmie 2 seconds

{¶19}  At 6:00:50 p.m., appellant called Richmond and the phone call lasted 18 seconds in duration.  The two then began exchanging text messages once again:

6:02:00 p.m. – RICHMOND:  Pull away real fast

6:02:18 p.m. – RICHMOND:  There talking about u

6:03:24: p.m. – APPELLANT:  What exactly is the reasoning I can't be seen or u can't been seen with me??

Richmond then called appellant at 6:06:21 p.m. and their phone call lasted 46 seconds in duration.

{¶20}  Appellant and Richmond had no phone contact for a couple of hours.  At 8:58:14 p.m., appellant texted Richmond, "Can I stop by and pick up the rest of the money?"  Appellant then called Richmond at 9:12:50 p.m. and 9:23:13 p.m., but those two calls were not answered by Richmond.  Appellant then sent the following texts to Richmond:

9:27:16 p.m. – APPELLANT:  Come on Ryan don't be doing this blowing me off ignoring me shit when u owe me money.  Just tell me what is going on.  We Wayy better friends then all this dude don't fucking ruin what we got after so long over some shit

- 9 -

like this… For real.

9:30:02 p.m. – APPELLANT:  Just keep it real with me.

At 10:37:50 p.m., around the time appellant went to Richmond's place to check on him, appellant placed a final call to Richmond, which went unanswered.

{¶21}  At trial, Detectives Mullis and Bishop both testified that from their experience in working drug investigations the conversation between appellant and Richmond on December 2, 2017 clearly concerned drugs.  Detective Mullis, who has more than 14 years of experience working on drug investigations, testified that his undercover work required knowledge of the slang, quantities, and typical terms associated with drug buys.  Based on the language in the text messages, the detectives believed appellant had purchased a gram of narcotics and had the dealer divide it in half, keeping the two halves separate so that she could provide half to Richmond.  Detective Mullis noted that powdery substances, particularly heroin, is sold in gram or half-gram quantities, and he believed the lingo used by appellant and Richmond indicated the drug involved was heroin.  Both detectives believed appellant provided Richmond with his half of the drugs and Richmond gave appellant some money in exchange.  However, Richmond did not give appellant all the money he owed her, as evidenced by appellant repeatedly reaching out to Richmond later that evening to get the rest of the money.

{¶22}  Detective Bishop indicated his review of the remaining text messages on Richmond's phone did not appear to be related to drug trafficking or efforts by Richmond to obtain drugs from anyone else.  As the messages appellant exchanged with Richmond made her a suspect in the investigation, Detective Bishop attempted to contact appellant on January 25, 2018.  Appellant did not answer and the detective left a voicemail.  The detective then attempted to contact appellant's girlfriend, Blankenship, but he did not have luck in reaching her either.  Appellant called the detective back later that day and when he

requested an interview to discuss Richmond's death, appellant claimed to be too busy. Appellant stated she would call him back to schedule something at a later date. On February 6, 2018, Detective Bishop called appellant to again request an interview. At this time, appellant stated she was getting over the death of Richmond and did not want to talk about it anymore. Detective Bishop asked appellant if she had a good number for Blankenship as he had not heard back from her. Appellant claimed that the two had broken up shortly after Richmond's death and that she had not talked to her.

{¶23} On February 7, 2018, Blankenship came to the police station to be interviewed by Detective Bishop. At that time, Blankenship consented to a forensic download of her phone. The forensic download showed that, contrary to appellant's claims, she had remained in contacted with Blankenship after Richmond's death. On January 25, 2018, the date of Detective Bishop's first contact with appellant, appellant had texted Blankenship to inform her that a detective from Union Township Police Department had called her about Richmond.

{¶24} Detective Bishop was cross-examined about the thoroughness of his investigation. He admitted that he did not speak to every person Richmond communicated with on the day of his death. This included an individual named Josh Gatz, who Richmond attempted to call at 7:02 p.m. on December 2, 2017. However, the forensic download of Richmond's phone indicates the duration of the call was zero seconds. Detective Bishop also did not talk to two individuals who had sent Richmond messages over Facebook Messenger. One individual, "Brandon," sent Richmond a message asking "where the perks," which were believed to be a reference to Percocet. Richmond responded to the message saying, "Idk bub. I don't mess with them anymore." Another individual, "Kristen," asked Richmond to meet her at a gas station and asked, "And did you wanna buy any H I. Anything else?" Ryan had responded to her message to say he was "[c]oming."

{¶25} After considering the foregoing testimony and evidence, the jury found appellant guilty on all charged offenses. At sentencing, the trial court found that the two counts of corrupting another with drugs and the involuntary manslaughter count all merged together. The state elected to proceed on the involuntary manslaughter conviction. Appellant was sentenced to eight years in prison for involuntary manslaughter, 12 months in prison for trafficking in heroin, and 12 months in prison for aggravated trafficking in drugs. The sentences were run concurrently, for a total stated prison term of eight years.

{¶26} Appellant appealed her convictions, raising two assignments of error. As the assignments of error are related, we will address them together.

{¶27} Assignment of Error No. 1:

{¶28} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT BY FAILING TO GRANT DEFENDANT'S RULE 29 MOTION FOR ACQUITTAL.

{¶29} Assignment of Error No. 2:

{¶30} THE TRIAL COURT ERRED IN ENTERING A FINDING OF GUILTY UPON THE JURY'S VERDICT BECAUSE SUCH VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶31} In her first assignment of error, appellant contends that the trial court erred in denying her Crim.R. 29 motion for acquittal as the state failed to present sufficient evidence of her convictions for involuntary manslaughter, corrupting another with drugs, trafficking in heroin, and aggravated trafficking in drugs (fentanyl). In her second assignment of error, she contends her convictions are against the manifest weight of the evidence.

{¶32} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." An appellate court reviews the denial of a Crim.R. 29(A) motion under the same

standard as that used to review a sufficiency-of-the-evidence claim. *State v. Mota*, 12th Dist. Warren No. CA2007-06-082, 2008-Ohio-4163, ¶ 5; *State v. Huston*, 12th Dist. Fayette Nos. CA2006-05-021 and CA2006-06-022, 2007-Ohio-4118, ¶ 5.

**{¶33}** Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶34}** A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. "While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, 'these issues are primarily matters for the trier of fact to decide.'" *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 81,

quoting *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26. An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.*, citing *Thompkins*, 78 Ohio St.3d at 387. Furthermore, although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶35} Appellant was convicted of trafficking in heroin and aggravated trafficking in drugs (fentanyl) in violation of R.C. 2925.03(A)(1), which provides that "[n]o person shall knowingly * * * [s]ell or offer to sell a controlled substance or controlled substance analog." She was also convicted on two counts of corrupting another with drugs in violation of R.C. 2925.02(A)(3), which provides that "[n]o person shall knowingly * * * [b]y any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent." A person acts knowingly when, regardless of purpose, "the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). To furnish a controlled substance is to "provide, supply or give access to" the substance. *State v. Richard*, 3d Dist. Marion No. 9-20-36, 2021-Ohio-2980, ¶ 64, citing *State v. Patterson*, 11th Dist. Trumbull No. 2013-T-0062, 2015-Ohio-4423, ¶ 86.

{¶36} Appellant was also convicted of involuntary manslaughter in violation of R.C. 2903.04(A), which provides that "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." The predicate felony underlying appellant's involuntary manslaughter conviction was either of

the trafficking offenses. With respect to the proximate cause element, this court has previously recognized the element is "satisfied where the defendant, 'sets in motion a sequence of events that make the death of another a direct proximate and reasonably inevitable consequence.'" *State v. Feltner*, 12th Dist. Butler No. CA2008-01-009, 2008-Ohio-5212, ¶ 12, quoting *State v. Lovelace*, 137 Ohio App.3d 206, 215 (1st Dist.1999). *See also State v. Wells*, 12th Dist. Warren No. CA2016-02-009, 2017-Ohio-420, ¶ 35.

> Generally, for a criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result meaning that the result would not have occurred "but for" the conduct. Second, when the result varied from the harm intended or the hazarded, it must be determined that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable.

*Lovelace* at 216, citing LaFave & Scott, *Criminal Law*, Section 35, at 246 (1972). However, "[i]t should be emphasized that for something to be foreseeable does not mean that it be actually envisioned." *Id.* at 219. "It is not necessary that the accused be in a position to foresee the precise consequence of his conduct; only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct." *State v. Losey,* 23 Ohio App.3d 93, 96 (10th Dist.1985).

{¶37} After reviewing the record, weighing inferences and examining the credibility of the witnesses, we find that appellant's convictions for trafficking in heroin, aggravated trafficking in drugs, involuntary manslaughter, and corrupting another with drugs were supported by sufficient evidence and were not against the weight of the evidence. The state presented testimony and evidence from which the jury could have found all the essential elements of the offenses proven beyond a reasonable doubt. The fact that the state relied on circumstantial evidence in proving appellant's guilt does not make her convictions any

less sound. As this court has repeatedly recognized, a defendant's convictions may be based on circumstantial evidence alone. *State v. Brown*, 12th Dist. Butler No. CA2014-12-257, 2015-Ohio-3407, ¶ 12; *Wells* at ¶ 33. "Circumstantial evidence is proof of certain facts and circumstances in a given case, from which the jury may infer other, connected facts, which usually and reasonably follow according to the common experience of mankind." *State v. Stringer*, 12th Dist. Butler No. CA2012-04-095, 2013-Ohio-988, ¶ 31. Circumstantial evidence inherently possesses the same probative value as direct evidence, and a conviction based on circumstantial evidence is no less sound than one based on direct evidence. *Brown* at ¶ 12.

{¶38} Through the presentation of appellant's and Richmond's December 2, 2017 text messages to one another, the state presented credible evidence that appellant knowingly sold and knowingly furnished to appellant two controlled substances, to wit, heroin and fentanyl. The texts indicate appellant had obtained "half" of a "whole one" for Richmond from a contact who was leaving for Chicago. When Richmond expressed concern that his "half" needed to actually weigh a "half," appellant assured him his substance was wrapped up and that she would not touch it. Detective Mullis, an experienced officer with knowledge of the slang, quantities, and typical terms associated with drug buys, testified that the language used in the texts indicated a reference to a powdery drug, most likely heroin. Mullis further testified that the discussion about the substance actually weighing a full half was indicative of a drug transaction, as it was common for traffickers to try to short a buyer.

{¶39} The text messages also demonstrated Richmond was concerned with being seen with appellant when appellant stopped to drop off his half of the substance. Richmond, whose job and living situation were conditioned upon him refraining from drug use, advised appellant not to park her vehicle in the drive so that the homeowner would not see them

together or witness the transaction. The texts also indicated that the drug transaction had occurred, and that Richmond had only paid appellant part of the money he owed her. Appellant texted Richmond later in the evening asking to come by to "pick up the rest of the money" that was owed to her. These texts, the baggie found in Richmond's bedroom the night of his overdose, which tested positive for heroin and fentanyl, and Richmond's toxicology results provide strong circumstantial evidence that appellant knowingly sold Richmond the controlled substances.

{¶40} By furnishing the controlled substances to Richmond, appellant caused Richmond serious physical harm. Serious physical harm to persons includes "[a]ny physical harm that carries a substantial risk of death" or "involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity." R.C. 2901.01(A)(5)(b) and (c). Both a lethal overdose and a nonlethal overdose where the victim loses consciousness have been found to constitute serious physical harm. *See State v. Potee*, 12th Dist. Clermont No. CA2016-06-045, 2017-Ohio-2926, ¶ 35; *State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶ 43; *State v. Wisniewski*, 8th Dist. Cuyahoga No. 110092, 2021-Ohio-3031, ¶ 31. Here, the state presented testimony from Dr. Stephens that the level of morphine from the heroin Richmond ingested was four times the amount needed to be lethal and that the combination of heroin and fentanyl made death more likely. Dr. Stephens explained Richmond died shortly after ingesting the combination of drugs, as evidenced by the lack of norfentanyl found in Richmond's blood and the levels of codeine, morphine, and 6- monoacetylmorphine found in his blood and urine, respectively. Moreover, Dr. Stephens testified that the amount of fentanyl in Richmond's system could have caused him to become unconsciousness.

{¶41} Appellant's act of selling the heroin and fentanyl to Richmond ultimately caused Richmond's death. The jury heard testimony from the coroner that the heroin found

in Richmond's system was "enough heroin to kill two of him" and that heroin, in combination with the fentanyl negated Richmond's respiratory capabilities. The recently taken dosage of heroin and fentanyl caused Richmond to stop breathing and his heart to stop pumping within a number of minutes, thereby leading to his death. The only evidence of heroin and fentanyl found in the residence where Richmond overdosed was the baggie found in Richmond's room which tested positive for heroin and fentanyl and the syringe from his overalls that tested positive for heroin, fentanyl, and tramadol. The toxicology report indicated there was no tramadol in Richmond's system at the time of his death, which is consistent with Dr. Stephens' testimony that Richmond most likely snorted the drugs rather than injecting them. As Richmond died of a heroin dose where fentanyl was present and because the baggie that contained heroin and fentanyl was found near Richmond's body when officers arrived on scene, the jury was entitled to conclude that the drugs provided in the baggie killed Richmond. From the text messages appellant exchanged with Richmond, her conduct in returning to Richmond's house later that evening to seek the rest of the payment for the drugs, and her act of searching through Richmond's pockets while Baker provided CPR to an overdosed Richmond, the jury was entitled to conclude that appellant sold the controlled substances that led to Richmond's death. There is nothing extraordinary or surprising about the manner of Richmond's death in relation to appellant's actions. "The possibility of an overdose is a reasonably foreseeable consequence of providing a controlled substance to another." *Wells*, 2017-Ohio-420 at ¶ 39.

{¶42} Appellant's argument that the jury had to rely on impermissible inference stacking to convict her of the charged offenses is without merit. Impermissible inference stacking occurs when a trier of fact "draw[s] an inference based entirely upon another inference, *unsupported by any additional fact or another inference from other facts*." (Emphasis added.) *State v. Braden*, 12th Dist. Preble No. CA2013-12-012, 2014-Ohio-

3385, ¶ 12. A trier of fact is permitted, however, to use parallel inferences with additional facts and to draw multiple, separate inferences from the same set of facts. *Id.* at ¶ 13, citing *State v. Maynard*, 10th Dist. Franklin No. 11AP-697, 2012-Ohio-2946, ¶ 27. "[A] second inference may be drawn upon a previous inference if the second inference is based at least in part on additional facts or inferences drawn from other facts." *State v. Cooper*, 147 Ohio App.3d 116, 126 (12th Dist.2002). Contrary to appellant's argument, the jury did not rely exclusively on the text messages to infer that appellant offered to sell Richmond drugs, that the two met up so appellant could deliver the drugs, or that the drugs appellant provided to Richmond were the heroin and fentanyl on which Richmond overdosed. Rather, in addition to the text messages, the jury had before it the physical evidence collected from Richmond's bedroom (the baggie and the syringe), the chemical analysis of said evidence, the toxicology report, the results of Richmond's autopsy, testimony from Baker about appellant's actions upon finding Richmond unresponsive in his bedroom, and testimony from Detective Mullis and Detective Bishop about their investigation into Richmond's death. From this evidence, the jury was entitled to find beyond a reasonable doubt that appellant committed the offenses of trafficking in heroin, aggravated trafficking in drugs (fentanyl), corrupting another with drugs, and involuntary manslaughter when she sold and furnished the controlled substances that caused Richmond's death.

{¶43} Accordingly, for the reasons set forth above, we find that appellant's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. The jury did not lose its way and create such a manifest miscarriage of justice that appellant's convictions must be reversed and a new trial ordered. Appellant's first and second assignments of error are overruled.

{¶44} Judgment affirmed.

PIPER, P.J., and BYRNE, J., concur.