[Cite as *State v. Wilson*, 2023-Ohio-1111.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-12-152 |
| | : | O P I N I O N |
| - vs - | | 4/3/2023 |
| | : | |
| CAMERON TREITAY KIDD WILSON, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2020-12-1581


Michael T. Gmoser, Butler County Prosecuting Attorney, and John C. Heinkel, Assistant Prosecuting Attorney, for appellee.

Law Office of John H. Forg, and John H. Forg, III, for appellant.


**BYRNE, J.**

{¶1} Appellant, Cameron Treitay Kidd Wilson, appeals from his conviction of two counts of murder and two counts of felonious assault related to the fatal shooting of Darrien Shamel. For the reasons set forth below, we affirm Wilson's convictions.

## I. Procedural and Factual Background

{¶2} In the early morning hours of June 2, 2020, Darrien Shamel was shot and killed in the doorway of his apartment with a 9 mm handgun. His mother called the police around 12:36 a.m. and officers arrived on the scene within minutes. In December of 2020, a Butler County grand jury indicted Wilson on two counts of murder and two counts of felonious assault.

{¶3} During a five-day trial, the state presented testimony from Daija Smith, Shamel's girlfriend, who testified that she was inside Shamel's apartment in view of the front door when Shamel answered the door. She stated that when Shamel opened the door, a tall white male, Blake Michels, gave Shamel a "dap hug."[1] At that same time, a lighter-skinned black male standing behind Michels, wearing all black clothing and a black beanie, shot Shamel twice—once in the head and once in the neck.

{¶4} The state also presented testimony from Officer Sean Figley who arrived at the scene just minutes after the shooting. Smith informed Officer Figley that a lighter-skinned black male shot Shamel. Testimony from Detective Robert Horton confirmed that investigators recovered two 9 mm shell casings at the scene of the shooting.

{¶5} The state presented the testimony of Blake Michels, who alleged that the following events occurred: Wilson picked up Michels and a friend, Camden Timenfeld[2], from Michels' home in Delhi. The three then traveled together in Wilson's car to several different locations before going to Hamilton so that Michels could purchase acid from Shamel. At some point during the evening, Wilson put on a black hoodie. He was also wearing a toboggan. When they arrived at Shamel's apartment, Michels and Wilson got

---

1. A "dap hug" is described by the witness to be a type of handshake where the individuals pull one another toward each other.

2. The record contains different spellings of this name.

out of the car and went to the front door. Timenfeld remained in the car. When Shamel opened the door, Michels gave him a "dap hug," and at that point Wilson, who was standing behind Michels, shot Shamel twice. Wilson told Michels to run. They returned to Wilson's car and Wilson drove back to his home in Harrison. When they arrived, Michels and Timenfeld remained in the car, and as Wilson exited the car, Michels saw an all-black firearm. Wilson remained inside his home for roughly five minutes before returning to the car to drive Michels and Timenfeld back to Michels' home in Delhi. In addition to this testimony, Michels also admitted that he was not truthful with the police during his initial interviews.

{¶6} Wilson testified in his own defense and denied that he was present at the scene of the shooting. He stated that he picked up Michels and Timenfeld from Michels' home earlier in the evening of June 1, but that he dropped them both off in Hamilton around 11:30 p.m. before returning to his home. He claims to have returned home around 12:15 a.m., where he spoke with his younger brother for a few minutes before driving to his girlfriend's house.

{¶7} On cross-examination, the prosecutor asked Wilson if he had access to any firearms and if he ever wore a black toboggan. Wilson responded that he owned a shotgun and two handgun cases, one of which was found empty during a search of Wilson's room. He also testified that he normally does not wear a black toboggan. Wilson was then asked about a video on his cell phone that showed him wearing a black beanie and waiving a 9 mm handgun. Wilson did not deny the existence of the video or dispute its contents.

{¶8} The defense also presented the testimony of two alibi witnesses. Wilson's mother, Pet Davis, testified that she saw Wilson at home, lying in bed, at 12:09 a.m. on the morning of the shooting. Wilson's younger brother, Cory Kidd, testified that Wilson was at home until 12:15 a.m., when Wilson left to go hang out with his girlfriend. He stated that

Wilson returned home around 12:45 a.m. and went to bed around 1:30 a.m.

{¶9} The state presented rebuttal evidence from Lance Kepple, a special agent with the Federal Bureau of Investigation's Cellular Analysis Survey Team (CAST). Special Agent Kepple presented his report on the historical cellular analysis for Wilson's and Michels' phone numbers, based on data obtained from their cellular service providers. The report showed the general locations of both cell phones on the evening of June 1, 2020, and into the morning hours of June 2, 2020. The data did not provide pinpoint locations and instead identified the general area in which the phones were located at times. But in general, the data suggested that the cell phones of Wilson and Michels were traveling together from the hours of 8:00 p.m. on June 1, 2020, until roughly 2:00 a.m. on June 2, 2020.

{¶10} According to the report, Wilson's phone was in Hamilton near Shamel's home at 12:17 a.m. and 12:32 a.m. on the morning of June 2. Michels' phone was in roughly the same location at 12:34 a.m. The report gave no indication that Wilson's phone was near his home at 12:15 a.m. or near his girlfriend's house shortly thereafter. Instead, the report indicated that at 12:56 a.m., both phones were south of Hamilton, but north of Wilson's home; at 1:24 a.m., both phones were south of Wilson's home but north of Michels' home; and at 1:58 a.m., both phones were near Michels' home.

{¶11} The jury convicted Wilson on all four counts. The trial court merged allied offenses and sentenced Wilson to 15 years to life in prison. Wilson now appeals, raising a single assignment of error for review.

**II. Law and Analysis**

{¶12} Wilson's Assignment of Error No. 1 states:

{¶13} THE TRIAL COURT ERRED IN CONVICTING WILSON OF MURDER AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶14} In his assignment of error, Wilson contends that his conviction was against the manifest weight of the evidence. Wilson disputes the state's reliance on circumstantial evidence, specifically the state's CAST report, which he alleges "cannot provide Wilson's exact location" at the time of the shooting. He also takes issue with the testimony of Smith and Michels. He argues that the descriptions of the shooter given by Smith were inconsistent and questionable. He also argues that Michels' testimony is the "only evidence that places Wilson at the scene of the crime," and that his testimony was not credible.

**A. Standard of Review**

{¶15} We first note that in his appellate brief, Wilson identifies an incorrect standard for making a manifest weight determination.[3] Wilson cites to a sufficiency of the evidence standard, but "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is essentially a test of adequacy, asking whether the evidence is legally sufficient to sustain a verdict. *Id.*

{¶16} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State*

---

3. In that same vein, Wilson also ties this incorrect standard to an improper standard for reasonable doubt, stating that reasonable doubt means "without any degree of uncertainty." It is well established that the definition of reasonable doubt, as set forth in R.C. 2901.05, is not "mere possible doubt," but instead is "proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs." *State v. Van Gundy*, 64 Ohio St.3d 230, 232 (1992).

*v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶17} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 12th Dist. Clinton No. CA2020-06-007, 2021-Ohio-466, ¶ 15.

## B. Analysis of the Evidence Presented at Trial

{¶18} Wilson alleges that the testimony of Daija Smith was inconsistent with a previous statement. Smith witnessed the shooting and testified that she saw a lighter-skinned black male shoot Shamel. Wilson argues that Smith's testimony is inconsistent with a 9-1-1 phone call, where "she identified the shooter as a white male." However, Smith did not call the police—Shamel's mother did. Although Shamel's mother was present at the scene, she did not witness the shooting.

{¶19} Wilson further argues that the state's reliance on Smith's description of the shooter is inconsistent with other evidence. Smith testified that the shooter was wearing all black clothing and a black beanie. A Snapchat video of Wilson taken on the evening of June 1 shows him wearing a white t-shirt and a blue pair of jeans. Wilson asserts that the Snapchat video shows that he was not wearing the clothing that Smith identified. However, Wilson admitted that there was a video of him on his own phone showing him wearing a black beanie and waiving a 9 mm handgun. Further, Michels testified that he saw Wilson put on a black hoodie and that he was wearing a toboggan at some point during the evening of June 1, 2020. It is thus reasonable to conclude that Wilson changed his clothes, or added another layer of clothing, at some point during the evening before arriving at Shamel's

apartment in Hamilton.

**{¶20}** Wilson also argues that his conviction is against the manifest weight of the evidence because the state's case "rests solely on the testimony of witness Blake Michels." Wilson asserts that Michels' testimony is unreliable because he lied to police during his initial interviews, and that his testimony is "inconsistent and suspect" because it leaves an "unexplained time gap" for what happened between the hours of 11:00 p.m. on June 1, 2020, and 12:17 a.m. on June 2, 2020. Wilson argues that his own testimony accounts for this period of time: he claims to have been at home.

**{¶21}** Though Wilson argues that Michels' testimony lacked credibility, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony. *State v. Lovelace*, 12th Dist. Warren No. CA2022-05-032, 2023-Ohio-339, ¶ 39, citing *State v. Lunsford*, 12th Dist. Brown No. CA2010-10-021, 2011-Ohio-6529, ¶ 17. The trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence. *State v. Johnson*, 12th Dist. Warren Nos. CA2019-07-076 and CA2019-08-080, 2020-Ohio-3501, ¶ 24. It is "entirely appropriate for the trier of fact to believe the testimony of some witnesses while disregarding the testimony of other witnesses." *State v. Lloyd*, 12th Dist. Warren Nos. CA2007-04-052 and CA2007-04-053, 2008-Ohio-3383, ¶ 51. Here, the jury, as the finder of fact, apparently determined that Michels was credible, and Wilson was not.

**{¶22}** Wilson also argues that the CAST report prepared by Special Agent Kepple "cannot pinpoint the exact location of a person making a call, only the general range in which the call was received." While the CAST report operates as circumstantial evidence as to Wilson's whereabouts on the night of Shamel's murder, "a defendant's convictions may be based on circumstantial evidence alone." *State v. Haines*, 12th Dist. Clermont No. CA2021-07-040, 2022-Ohio-1145, ¶ 37. "[A] conviction based on purely circumstantial

evidence is no less sound than one based on direct evidence." *State v. Babyak*, 12th Dist. Madison Nos. CA2009-10-023 and CA2010-03-006, 2010-Ohio-3820, ¶ 18.

**{¶23}** The CAST report showed that the cell phones of Michels and Wilson were near the scene of the shooting between 12:17 a.m. and 12:34 a.m. on the morning of June 2, 2020. The report gave no indication that Wilson's phone was at his home or near his girlfriend's house, which is where he claims to have been during that time. Wilson gave no explanation for why his phone was detected in Hamilton during that time—he simply argues that the report cannot provide his exact location at the time of the shooting. But while the report did not provide a precise location, it did identify the general area in which the phone was located at various times, and it was reasonable for the jury to conclude that those locations and times were consistent with the state's theory of the case.

**{¶24}** After reviewing the record, we find that Wilson's convictions were not against the manifest weight of the evidence. Although the state's case was partially based on circumstantial evidence, the state presented convincing evidence indicating that Wilson committed the murder of Darrien Shamel. "Circumstantial evidence and direct evidence have the same probative value, and in some instances, certain facts can only be established by circumstantial evidence." *State v. Mobus*, 12th Dist. Butler No. CA2005-01-004, 2005-Ohio-6164, ¶ 51.

**{¶25}** The jury chose to credit the witnesses presented by the state and believe the prosecution's version of events. The jury weighed the evidence and concluded that Wilson was the individual who shot Darrien Shamel. It is within the purview of the jury to believe some, all, or none of witness testimony, as the jury is in the best position to hear the witnesses speak and examine their demeanor. *Johnson*, 2020-Ohio-3501 at ¶ 24; *Lloyd*, 2008-Ohio-3383 at ¶ 51. We find no merit to Wilson's argument that the jury lost its way in weighing the evidence and finding him guilty.

### III. Conclusion

**{¶26}** For the reasons stated above we overrule Wilson's sole assignment of error.

**{¶27}** Judgment affirmed.

M. POWELL, P.J., and HENDRICKSON, J., concur.