[Cite as *State v. Sperry*, 2025-Ohio-2626.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2024-12-087 |
| - vs - | : | <u>OPINION AND</u><br><u>JUDGMENT ENTRY</u><br>7/28/2025 |
| | : | |
| SAMUEL CHRISTIAN SPERRY, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 23CR40847

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Gary A. Rosenhoffer and R. Scott Croswell, for appellant.

## **O P I N I O N**

**M. POWELL, J.**

{¶ 1} Appellant, Samuel Christian Perry, appeals his conviction in the Warren County Court of Common Pleas for aggravated vehicular homicide and aggravated

vehicular assault.

{¶ 2} This case involves a two-vehicle collision on the morning of April 2, 2023, during which appellant's Hyundai Genesis struck the left rear of a Chevrolet Trax, killing the driver, Shirley Coletta, and seriously injuring the passenger, Patricia Jump. At the time of the crash, both vehicles were travelling northbound on I-71. Appellant was in the far left lane, travelling at 124 m.p.h., and Coletta was in the process of changing lanes from the left center lane to the far left lane, travelling at 75 m.p.h. A subsequent test of appellant's blood revealed the presence of alcohol, marijuana, and marijuana metabolite. The blood test also revealed the presence of clonazepam and clonazepam metabolite.

{¶ 3} On August 7, 2023, appellant was charged in a seven-count indictment with aggravated vehicular homicide in violation of R.C. 2903.06(A)(1)(a), a second-degree felony, for causing death as the proximate result of committing an OVI offense (Count 1); aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(a), a third-degree felony, for causing death in a reckless manner (Count 2); aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a), a third-degree felony (proximate result of OVI) (Count 3); aggravated vehicular assault in violation of R.C. 2903.08(A)(2)(b), a fourth-degree felony (recklessly) (Count 4); and three counts of operating a vehicle under the influence of alcohol or drugs, all misdemeanors of the first degree, in violation of R.C. 4511.19(A)(1)(a) (OVI), R.C. 4511.19(A)(1)(j)(vii) (prohibited concentration of marijuana), and R.C. 4511.19(A)(1)(j)(viii)(II) (prohibited concentration of marijuana metabolite).

{¶ 4} Appellant waived his right to a jury trial and the matter proceeded to a bench trial on September 6, 2024. The State presented the testimony of Michael Kirk and Sean Gifford, two motorists who were travelling northbound on I-71 at the time of the crash, Ohio State Highway Patrol Sergeant Jacob Kunka, Hamilton County Coroner's Office Chief of Toxicology Robert Topmiller, and Ohio State Trooper Christopher Krantz.

{¶ 5} Kirk testified he was entering northbound I-71 from the Fields Ertel entrance ramp when he observed appellant's Genesis "flying" in the far left lane, "passing people like they were still." Kirk believed appellant was likely travelling at 120 m.p.h. As Coletta was moving from the left center lane into the far left lane to pass another vehicle, Kirk observed the Genesis hit Coletta's Trax "full force," causing the Trax to flip and roll into a ditch. Kirk testified that he saw Coletta use her turn signal to change lanes, that he did not see appellant brake before the collision, and that appellant was trying to change lanes when he struck Coletta. Kirk testified the collision between the Genesis and the Trax was very violent.

{¶ 6} Gifford was travelling northbound on I-71 in a center lane at the time of the crash. The weather was sunny and the traffic was relatively heavy on that Sunday morning. Gifford testified that soon after appellant passed him at a high rate of speed, he observed an explosion in front of him and the Trax rolling multiple times across the highway, from the left lanes into a ditch on the right hand side of I-71 north. Gifford did not witness the collision. Gifford testified that appellant's significant high speed was a safety concern for the amount of traffic on the highway that day, and that appellant passed him "at a speed so quick that it jostled [his] car."

{¶ 7} Sergeant Kunka, a certified Drug Recognition Expert, responded to the crash scene. Sergeant Kunka talked to appellant inside an ambulance where the latter was being treated. The sergeant noticed an odor of an alcoholic beverage inside the ambulance and observed that appellant's speech was "slow, slurred, thick," that his movements were "slow and lethargic at times," and that he appeared to be sedate, staring ahead "with his mouth kind of agape." Sergeant Kunka believed the foregoing indicated that appellant was impaired by drugs and/or alcohol. After the doctor on the scene confirmed that appellant was "cleared medically" and "was good to go," Sergeant Kunka

administered several field sobriety tests. The sergeant noticed that appellant was unsteady on his feet while walking from the ambulance to the patrol car and that he was swaying during some of the field sobriety tests.

{¶ 8} On the horizontal gaze nystagmus test, Sergeant Kunka observed six out of six clues in each eye. During a Lack of Convergence Test, the sergeant observed a lack of convergence in appellant's right eye, indicating the presence of alcohol or drugs. The walk-and-turn test and the one-leg stand test further revealed several clues of impairment. The sergeant also observed eyelid tremors, which he testified were commonly associated and very prominent in marijuana usage. Based upon his observations while interacting with appellant and administering the field sobriety tests, Sergeant Kunka concluded that appellant was appreciably impaired by drugs and/or alcohol and that he was unsafe to drive. The sergeant arrested appellant. In a search of appellant's person incident to his arrest, a marijuana pipe was found in his pocket.

{¶ 9} Sergeant Kunka transported appellant to the Ohio State Patrol Lebanon post where appellant refused to provide breath and urine samples. Sergeant Kunka then obtained a sample of appellant's blood pursuant to a search warrant. The record indicates that appellant's blood was drawn almost three hours after the crash. Analysis of appellant's blood sample revealed a concentration of alcohol of 0.029 grams per 100 milliliters, a concentration of marijuana of 12.47 nanograms per 100 milliliters—over six time the legal limit, and a concentration of marijuana metabolite of 369.75 nanograms per 100 milliliters—over seven times the legal limit. Analysis of the blood sample also revealed the presence of clonazepam and clonazepam metabolite. In a written statement provided while he was in the ambulance, appellant stated he "was in the left lane, went to merge into the right lane and Boom! I came to after a bunch of bangs." Appellant stated he was travelling at 75 m.p.h. He denied drinking alcohol, smoking marijuana, or using

illicit drugs that day.

{¶ 10} Toxicologist Topmiller testified concerning the dissipation of marijuana and marijuana metabolites from an individual's blood and the combined effect of marijuana, marijuana metabolite, clonazepam, clonazepam metabolite, and alcohol on an individual's ability to operate a vehicle. His report was admitted into evidence by stipulation. Topmiller testified that the concentration of marijuana in appellant's blood three hours after the crash suggested recent usage because marijuana dissipates from someone's blood fairly quickly whereas marijuana metabolite stays in the person's blood for a long period of time. Topmiller stated that appellant's marijuana concentration would have been higher at the time of the collision. Relying upon three assumptions discussed below, Topmiller calculated that appellant's blood ethyl alcohol concentration at the time of the collision was in the range of 0.056-0.101 grams per 100 milliliters.

{¶ 11} Topmiller explained that effects associated with marijuana usage include relaxation, lack of concentration, altered time and space perception, sedation, and disorientation, and that effects associated with clonazepam usage include sedation, drowsiness, poor coordination, blurred or double vision, and confusion. Regarding how marijuana affects and impairs a person's ability to operate a vehicle, Topmiller explained that there is deterioration in a driver's ability to maintain headway travel and an increase in lateral movement of the vehicle within and outside the lane of travel, and that the driver will process visual information more slowly than normal resulting in prolonged reaction time when responding to situations. Topmiller further explained that marijuana disrupts a driver's ability to concentrate and maintain continuous attention, distorts the driver's perception of time and distance, and decreases the driver's ability to shift attention quickly between various tasks.

{¶ 12} Topmiller also explained that a person with a blood ethyl alcohol

concentration between 0.056 g/100mL and 0.101 g/mL "will have diminished divided attention skills, judgments, and control when operating a motor vehicle" because the driver will process visual information more slowly than normal resulting in prolonged reaction time, which in turn decreases the driver's ability to control and maintain the vehicle within the lane of travel and slows down the driver's ability to monitor and respond to situations both inside and outside the vehicle, including the likelihood of incorrect decision making.

{¶ 13} Topmiller testified that the combination of substances in appellant's blood would have adversely affected appellant's ability to drive and that he would have been experiencing some degree of cognitive impairment, including an inability to think clearly and react and respond quickly to situations outside of the vehicle.

{¶ 14} Trooper Krantz testified as an accident reconstruction expert. His report was admitted into evidence by stipulation. His investigation included reviewing an ODOT video depicting the Trax's near complete lane change at the time it was struck by the Genesis, and retrieving information from the vehicles' event data recorders ("EDR"). The vehicles' respective EDR indicated that in the five seconds leading up to the collision, appellant accelerated from 121 m.p.h. to 124 m.p.h. while Coletta drove at a constant speed of 74-75 m.p.h. The Genesis' EDR also indicated that appellant did not brake, slow down, or take other evasive actions in the few seconds leading up to the collision. Trooper Krantz expressed the opinion that the collision occurred as Coletta was making a lane change and resulted from appellant striking the left rear side of Coletta's vehicle at a speed of 124 m.p.h. The trooper's testimony and his report both noted the presence of alcohol and drugs of abuse in appellant's system at the time of the collision.

{¶ 15} At the close of the State's case-in-chief, appellant moved for acquittal pursuant to Crim.R. 29, arguing that the State failed to prove his impairment was the

proximate cause of the collision, Coletta's death, and Jump's serious physical harm. The trial court denied the motion. Appellant then presented the testimony of Neal Gilreath, a traffic crash reconstruction expert. Gilreath authenticated his report and was cross-examined by the State. Gilreath's report was stipulated into evidence at the onset of the trial. The report noted that (1) the Trax was only partially in the far left lane at the time of the collision, (2) the investigation did not reveal whether Coletta had activated the left turn signal before the attempted lane change, (3) Coletta moved directly into the Genesis' path of travel, (4) it did not appear that Coletta tried to avert the collision by either rapid acceleration or returning to the left center lane, (5) Coletta erred by not determining whether it was safe to change lanes, and (6) "[a]n average driver at regular highway speeds would not have had enough time to perceive, react, and respond to the [Trax's] presence and avoid the collision once it departed its travel lane and began to enter the left lane."

{¶ 16} Upon comparing the actions of appellant and Coletta and considering the Genesis' speed, Gilreath opined that Coletta's decision to change lanes, thereby placing her vehicle directly in the travel path of the Genesis, was the proximate cause of the collision: "The short reaction time for oncoming drivers meant a collision would have occurred even with a significantly smaller speed difference. In other words, [Coletta's] actions in the natural and continuous sequence of events directly produced the impact, and without her lane change, this crash would not have occurred." The report does not mention appellant's impairment or the presence of alcohol and drugs in his system. When asked on cross-examination whether appellant's "cognitive functions were less because of the fact he was under the influence of marijuana or making bad judgments," Gilreath replied, "I wasn't asked to analyze those specific portions. All I was asked to do was analyze the facts surrounding the impact between the two vehicles."

{¶ 17} The trial court found appellant guilty as charged and sentenced him on November 13, 2024. At sentencing and pursuant to R.C. 2941.25, the trial court merged several of the offenses, including Count 2 (aggravated vehicular homicide—recklessness) into Count 1, and Count 4 (aggravated vehicular assault—recklessness) into Count 3. The trial court sentenced appellant to a mandatory 6-9-year prison term on Count 1 (aggravated vehicular homicide—OVI) and a consecutive 36-month prison term on Count 3 (aggravated vehicular assault—OVI), for an aggregate prison term of 9-12 years. The trial court also imposed a lifetime driver's license suspension.

{¶ 18} Appellant now appeals, raising five assignments of error. Appellant's first, third, and fifth assignments of error will be considered together; his fourth assignment of error will be addressed out of order.

{¶ 19} Assignment of Error No. 1:

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT FAILED TO GRANT THE DEFENSE MOTION TO DISMISS WHEN THE PROSECUTION RESTED ITS CASE IN CHIEF.

{¶ 20} Assignment of Error No. 3:

IN ORDER TO BE CONVICTED AS CHARGED, THE PROSECUTION WAS REQUIRED TO PROVE BEYOND A REASONABLE DOUBT THAT SPERRY'S IMPAIRMENT PROXIMATELY RESULTED IN THE CRASH.

{¶ 21} Assignment of Error No. 5:

THE FINDING OF GUILTY AS TO ALL COUNTS IS AGAINST THE MANIFEST WEIGHT AND THERE IS INSUFFICIENT EVIDENCE TO SUPPORT GUILT.

{¶ 22} In his first, third, and fifth assignments of error, appellant argues that the trial court erred in denying his Crim.R. 29 motion for acquittal, that his convictions for aggravated vehicular homicide in violation of R.C. 2903.06(A)(1)(a) and aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a) were not supported by sufficient

evidence, and that these convictions were against the manifest weight of the evidence. Specifically, appellant asserts that the State failed to prove that his impairment was the proximate cause of the collision and thus of Coletta's death and Jump's injuries.

{¶ 23} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal . . . if the evidence is insufficient to sustain a conviction of such offense or offenses." An appellate court reviews the denial of a Crim.R. 29(A) motion under the same standard as that used to review a sufficiency-of-the evidence claim. *State v. Wells*, 2017-Ohio-420, ¶ 29.

{¶ 24} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 1997-Ohio-52, ¶ 23. When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *Wells* at ¶ 30. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 25} On the other hand, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *Wells*, 2017-Ohio-420 at ¶ 31. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of

justice that the conviction must be reversed and a new trial ordered. *Id.* In reviewing the evidence, an appellate court must be mindful that the trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *Id.* Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, citing *Thompkins*, 1997-Ohio-52 at ¶ 25.

{¶ 26} Appellant was convicted of aggravated vehicular homicide in violation of R.C. 2903.06(A)(1)(a), which provides, "No person, while operating . . . a motor vehicle . . . shall cause the death of another . . . [a]s the proximate result of committing an OVI offense." Appellant was also convicted of aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a), which provides in relevant part, "No person, while operating . . . a motor vehicle shall cause serious physical harm to another person . . . [a]s the proximate result of committing a violation of division (A) of section 4511.19 of the Revised Code."

{¶ 27} Thus, the State was required to present evidence that (1) appellant was operating the Genesis, (2) his operation of the vehicle caused Coletta's death and serious physical harm to Jump, (3) he committed a violation of R.C. 4511.19(A), and (4) Coletta's death and Jump's serious physical harm proximately resulted from appellant's violation of R.C. 4511.19(A). R.C. 4511.19 outlines OVI offenses. Appellant's convictions for aggravated vehicular homicide under R.C. 2903.06(A)(1)(a) and aggravated vehicular assault under R.C. 2903.08(A)(1)(a) were predicated on appellant's violation of R.C. 4511.19(A)(1)(a), 4511.19(A)(1)(j)(vii), and 4511.19(A)(1)(j)(viii)(II).

{¶ 28} R.C. 4511.19(A)(1)(a) prohibits driving "under the influence of alcohol, a drug of abuse, or a combination of them." "Under the influence of alcohol covers . . . any abnormal mental or physical condition which is the result of indulging in any degree in the consumption of alcohol and which tends to deprive the one so using it of the clearness of

intellect and control of himself which he would otherwise possess." *State v. Hardy*, 28 Ohio St.2d 89, 90 (1971). R.C. 4511.19(A)(1)(a) does not require a specific concentration of alcohol or drug of abuse, and a defendant's behavior is a primary consideration. *State v. Naylor*, 2024-Ohio-1648, ¶ 45 (11th Dist.).

{¶ 29} By contrast, R.C. 4511.19(A)(1)(j) prohibits driving with a certain concentration of a controlled substance or metabolites of a controlled substance in one's urine or blood. As relevant here, R.C. 4511.19(A)(1)(j)(vii) prohibits driving with at least two nanograms of marijuana by blood. R.C. 4511.19(A)(1)(j)(viii)(II) prohibits driving with at least 50 nanograms of marijuana metabolite by blood. In light of appellant's blood test results showing a concentration of marijuana of 12.47 nanograms per 100 milliliters and a concentration of marijuana metabolite of 369.75 nanograms per 100 milliliters, the State proved appellant had a proscribed amount of marijuana and marijuana metabolite in his system at the time of the collision.

{¶ 30} It is well established that the definition of cause or "proximate cause" in criminal cases is identical to the definition of "proximate cause" in civil negligence cases. *State v. Hall*, 2017-Ohio-879, ¶ 72, fn. 4 (12th Dist.); *Naylor*, 2024-Ohio-1648 at ¶ 51. The general rule is that a defendant's conduct is the proximate cause of injury or death to another if the defendant's conduct (1) is a "substantial factor" in bringing about the harm and (2) there is no other rule of law relieving the defendant of liability. *Naylor* at ¶ 51. "Proximate cause does not require that the conduct of one defendant be the sole cause of a legal injury. As a matter of law, there may be more than one proximate cause of an injury." *State v. Dunham*, 2014-Ohio-1042, ¶ 48 (5th Dist.), citing *Taylor v. Webster*, 12 Ohio St.2d 53 (1967). A defendant "will not escape liability merely because factors other than his own acts contributed to the death, so long as those factors were not the sole cause." *State v. Quinn*, 2025-Ohio-158, ¶ 54 (6th Dist.).

{¶ 31}We find that the State presented sufficient evidence that appellant's violation of R.C. 4511.19(A) caused the collision that led to Coletta's death and Jump's serious physical harm. The fact that Coletta was changing lanes and moving into appellant's path of travel when appellant struck her vehicle does not prevent appellant's impairment and violation of R.C. 4511.19(A) from being a proximate cause of Coletta's death and Jump's injuries. *See State v. Stanley*, 2004-Ohio-3040 (7th Dist.). Through Topmiller's testimony and report, the State presented evidence regarding the manner in which the various substances in appellant's system would adversely affect a person's ability to drive, including prolonged reaction time, distortion of time and distance, disruption of concentration and attention, and the synergistic effect of the various substances found in appellant's system. Topmiller noted that appellant's blood sample was obtained almost three hours after the crash, suggesting the concentrations would likely have been greater at the time of the collision. Based upon appellant's driving, his behavior at the scene of the crash, his performance on the field sobriety tests, and the concentration of substances in his system, Topmiller expressed the opinion that appellant "would have been experiencing some degree of cognitive impairment at the time of the motor vehicle crash, adversely affecting his ability to safely operate a motor vehicle."

{¶ 32}Topmiller's opinion was corroborated by other evidence. The Genesis' EDR data indicated that appellant did not react to Coletta's vehicle being in front of him as appellant neither slowed down or braked, nor took evasive action prior to the collision. Rather, the EDR data showed that appellant accelerated to 124 m.p.h. in the five seconds leading up to the collision. Sergeant Kunka's observations of appellant at the scene of the crash and his performance on the field sobriety tests indicated that appellant was impaired. The State therefore proved that appellant, while operating the Genesis, caused Coletta's death and Jump's injuries as a proximate result of committing a violation of R.C.

4511.19(A).

{¶ 33} Our conclusion is not changed by the Sixth District Court of Appeals' decision in *State v. Moore*, 2019-Ohio-3705 (6th Dist.), a case appellant cites in support of his argument. In that case, the defendant was convicted of, inter alia, aggravated vehicular homicide in violation of R.C. 2903.06(A)(1)(a). The predicate offense was R.C. 4511.19(A)(1)(j)(ii), which prohibits driving with certain concentrations of cocaine in one's urine or blood. A blood test found cocaine metabolite in the defendant's blood, which an expert testified was inactive. On appeal, the defendant argued that the State presented insufficient evidence that her violation of R.C. 4511.19(A)(1)(j)(ii) was the proximate cause of the victim's death because the State did not ask the expert whether anything in her blood would have affected her ability to operate a vehicle.

{¶ 34} The court of appeals agreed. The court found there was insufficient evidence to prove aggravated vehicular homicide because there was no evidence that the defendant's act of driving with a prohibited concentration of cocaine in her blood was the direct cause of the victim's death, and without which, his death would not have occurred. *Id.* at ¶ 27. Specifically, "The state furnished no evidence regarding the potential effects that a prohibited concentration of cocaine in a person's blood would have on a person, or on a person's ability to operate a vehicle. Without such evidence, the state failed to prove that as the proximate result of [the defendant] driving with a prohibited concentration of cocaine in her blood, [the defendant] caused [the victim's] death." *Id.*

{¶ 35} We find that *Moore* is inapplicable here. Unlike *Moore*, the State presented evidence in the case at bar, as summarized above, regarding the effects alcohol impairment and a concentration of marijuana both have on a person's ability to operate a vehicle. In light of Topmiller's testimony, Sergeant Kunka's observations of appellant at the scene of the crash and during the field sobriety tests, and the Genesis' EDR data, the

trial court did not err in finding that appellant's impairment was a proximate cause of the collision, Coletta's death, and Jump's injuries. *See Quinn*, 2025-Ohio-158; *State v. Massucci*, 2021-Ohio-88 (6th Dist.).

{¶ 36}Appellant, however, challenges Topmiller's calculation of appellant's blood alcohol level at the time of the collision because Topmiller relied on assumptions that if faulty would render such calculation incorrect. Topmiller calculated appellant's blood ethyl alcohol concentration at the time of the collision by making the following assumptions: (1) appellant had absorbed into his bloodstream all consumed alcohol by the time of the collision, i.e., appellant had not consumed any alcohol shortly before the collision, (2) appellant eliminated the alcohol from his bloodstream at a rate of between 0.010 g/100 mL/hour and 0.025 g/100mL/hour, and (3) appellant did not consume any alcohol between the time of the collision and the time his blood was drawn. Topmiller testified that the second assumption was based on multiple toxicology articles and that it was the widest range possible that included the greatest number of people. On cross-examination, Topmiller admitted that the assumptions may or may not be true, were generic in nature, and were not based on information or knowledge specific to appellant. Relying upon Topmiller's admission on cross-examination, appellant now challenges Topmiller's calculation. However, the fact that Topmiller relied on certain assumptions in conducting his analysis goes to the weight, and not the admissibility of his testimony. *State v. Barrett*, 2004-Ohio-5530, ¶ 27 (12th Dist.).

{¶ 37}In light of the foregoing, we find that appellant's conviction for aggravated vehicular homicide in violation of R.C. 2903.06(A)(1)(a) and aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a) were supported by sufficient evidence and were not against the manifest weight of the evidence.

{¶ 38}Appellant was also convicted of aggravated vehicular homicide in violation

of R.C. 2903.06(A)(2)(a) (Count 2) and aggravated vehicular assault in violation of R.C. 2903.08(A)(2)(b) (Count 4). Both offenses require the mental state of recklessness. In his fifth assignment of error, appellant ostensibly argues that these convictions are not supported by sufficient evidence and are against the manifest weight of the evidence because the State failed to prove he operated the Genesis recklessly.

{¶ 39} We need not review appellant's sufficiency and weight of the evidence argument regarding Counts 2 and 4. At sentencing, Count 2 was merged into Count 1, Count 4 was merged into Count 3, and the trial court sentenced appellant on Counts 1 and 3. The Ohio Supreme Court has held that a "'conviction' consists of a guilty verdict *and* the imposition of a sentence or penalty." (Emphasis in original.) *State v. Whitfield*, 2010-Ohio-2, ¶ 12. "Therefore, if a guilty verdict is merged with another count for purposes of sentencing pursuant to R.C. 2941.25, that guilty verdict remains unsentenced and does not constitute a 'conviction' subject to appellate review." *State v. Kinney*, 2025-Ohio-1620, ¶ 82 (6th Dist.). "Put simply, in cases where separate counts are merged and the state elects the count on which the trial court will impose sentence, only the count that includes both a guilty verdict and sentence is subject to this court's review." *Id. See also State v. Powell*, 49 Ohio St.3d 255, 263 (1990) (because the trial court merged convictions with one another, the defendant received only one sentence, and an erroneous verdict on the merged count would be harmless beyond a reasonable doubt).

{¶ 40} In light of the foregoing, appellant's first, third, and fifth assignments of error are overruled.

{¶ 41} Assignment of Error No. 4:

{¶ 42} CONVICTION OF A PREDICATE OFFENSE IS INSUFFICIENT TO SATISFY THE PROXIMATE RESULT REQUIREMENT OF THE AGGRAVATED VEHICULAR HOMICIDE AND AGGRAVATED VEHICULAR ASSAULT STATUTES.

- 15 -

{¶ 43} In appellant's words, "This Assigned Error is the First Proposition of Law in a case that has been accepted for review by the Supreme Court of Ohio, *State of Ohio v. Balmert*, Supreme Court Case No. 2024-0699." As appellant correctly states, the Ohio Supreme Court has accepted *State v. Balmert*, 2024-Ohio-1207 (9th Dist.), for review, including Proposition of Law No. I: "In an aggravated vehicular assault or homicide case, proximate cause is its own separate and distinct element that must be proven. A mere OVI violation, by itself, is not sufficient to satisfy the proximate cause requirement of aggravated vehicular assault or homicide." The Supreme Court heard oral arguments on April 23, 2025. The case is currently awaiting decision, and unless and until the Supreme Court issues a decision in that case adopting that proposition of law, we decline to adopt such proposition of law or apply it to the case at bar.

{¶ 44} Appellant's fourth assignment of error is overruled.

{¶ 45} Assignment of Error No. 2:

> THE TRIAL JUDGE COMMITTED PREJUDICIAL ERROR BY POSING QUESTIONS DURING THE TRIAL WHEREIN THE QUESTIONS WERE TO BE ANSWERED "TO A REASONABLE DEGREE OF CERTAINTY."

{¶ 46} Appellant argues that the trial court abandoned its impartial role and engaged in advocacy when it questioned Trooper Krantz over defense objection.

{¶ 47} At the outset, we note that contrary to appellant's suggestion, he never objected to the trial court's questioning of Trooper Krantz. Rather, appellant objected only when Trooper Krantz testified he believed Coletta looked into her side-view mirror before changing lanes. Therefore, "our review is for plain error only." *State v. West*, 2022-Ohio-1556, ¶ 28. Under the plain error standard, "the defendant bears the burden of 'showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.'"

*Id.* at ¶ 22. Notice of plain error is taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Baker*, 2024-Ohio-2856, ¶ 39 (12th Dist.).

{¶ 48} Evid.R. 614(B) expressly authorizes a trial court to "interrogate witnesses, in an impartial manner, whether called by itself or by a party." Absent any showing of bias, prejudice, or prodding of a witness to elicit partisan testimony, it will be presumed that the trial court interrogated the witness in an impartial manner in an attempt to ascertain a material fact or develop the truth. *State v. Batson*, 1999-Ohio-280, ¶ 41. The trial court "may question a witness concerning matters that are 'clearly relevant to the independent determinations which the court is called upon to make.'" *State v. Daugherty*, 2002-Ohio-1183, ¶ 6 (11th Dist.). Thus, impartial questions that attempt to clarify the testimony and are directed to relevant factual issues are permitted under Evid.R. 614(B). *State v. Sloan*, 2005-Ohio-2932, ¶ 14 (7th Dist.). A trial court's questioning of a witness is not deemed partial for purposes of Evid.R. 614(B) merely because the evidence elicited during the questioning is damaging to one of the parties. *State v. Hough*, 2024-Ohio-2430, ¶ 31 (10th Dist.).

{¶ 49} Following Trooper Krantz's cross-examination, the trial court first advised him to let the court know "if this is outside of your area of expertise or if it's a question you can't answer." The court then proceeded to ask the following questions:

> THE COURT: So, my question for you is assuming for the sake of argument that [Coletta] sees Mr. Sperry's vehicle, either in her-I guess it would be in her mirror. Assuming that she sees him, and she [begins] her turn, assuming that he is making - or assuming that he's traveling seventy-five miles an hour, same as she is. If that's true, then how far back is he going to be [a]way from her, instead of traveling one hundred and twenty-four miles an hour and hitting her, traveling seventy-five miles an hour-how far back is he going to be?
>
> A: He's going to be whatever distance they are apart, they will

remain a constant distance because she was traveling seventy-five, so if he was going seventy-five, they're just going to remain that equal distant part. He has to be going faster than her to gain on her. For her to make that lane change, she was - they say partially - I'm going to say she was mostly, mostly, all but one foot and even if you want to argue that, it's less than that, because the Ohio Supreme Court rule that you can actually drive on your pavement marking and still be within your lane of travel, so for her to make that lane change, nobody will know what she saw, what she perceived, nobody can tell you that. I think she looked in her mirror –

MR. CROSWELL (Defense counsel): Objection.

THE COURT: Overruled. As long as what you're going to tell me is to a reasonable degree of certainty. Is what you're going to tell me going to be to a reasonable degree of certainty?

A: Yes, I believe so.

THE COURT: Okay. Go ahead.

A: I believe that she looked in her mirror and she saw, who knows what she saw, but the time that it took her to make her lane change, Mr. Sperry's approaching her at one hundred twenty-four miles per hour-the average person when they would look in their side mirror, would not know that a vehicle was approaching them at that speed. Most people check their mirror, make sure it's safe to make the lane change, check back ahead to make sure traffic isn't slowing and then they proceed to make their lane change. I mean, I make my living on the interstate. I see this all the time.

THE COURT: So, my follow up question to you would be, and, this is the question that I don't know if you can answer or not, is how much time is - I want to say lost, by him traveling the difference between one hundred and seventy - I'm sorry - the difference between going seventy-five miles an hour and a hundred and twenty-four miles an hour?

A: I would have to do the math, but whatever the distance is, that's how many feet per second he's traveling faster, from one speed to the other.

THE COURT: And, without some distance, it's a formula that you can't calculate, right?

A: Yeah, you would need some type of distance to throw into that calculation.

- 18 -

> THE COURT: And, nothing in the evidence that you have seen so far suggest that we have any kind of distance, right?
>
> A: Correct. The best that I could do in my analysis of the collision, was there's five seconds of pre-crash data within that event, the data recorders in those vehicles, so I did a time-distance analysis, based off where the vehicles were in relationship to impact and where they were in relationship to each other, based within those five seconds.

{¶ 50} We find no error, plain or otherwise. Appellant does not identify the manner in which he was prejudiced by the trial court's questioning, and simply asserts the trial court crossed the line into advocacy. The trial court's questioning was limited and was neither excessive nor prejudicial. In fulfilling its duty to see that the truth was developed, the trial court simply asked certain questions for purposes of clarification, and did not demonstrate bias or prejudice in the manner it conducted the trial. Rather, the trial court demonstrated its desire to develop all the pertinent facts necessary for its determination. There is no showing that the trial court was acting partially or was doing anything more than ascertaining the facts in the case. Furthermore, this was a bench trial. The trial court is therefore accorded greater flexibility in questioning witnesses because where there is no jury, there is no one to be prejudicially influenced by the judge's demeanor. *Sloan*, 2005-Ohio-2932 at ¶ 14; *Bartells v. Bertel*, 2018-Ohio-21, ¶ 47 (12th Dist.).

{¶ 51} Appellant's second assignment of error is overruled.

{¶ 52} Judgment affirmed.

PIPER, P.J., and SIEBERT, J., concur.

---

# J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robin N. Piper, Presiding Judge

/s/ Mike Powell, Judge

/s/ Melena S. Siebert, Judge